Opinion issued
May 13, 2010.

 

 

 

 

 

 

 

 

 

 

 

 

 

 

            

 

 








 








 










 

 

In The

Court of Appeals

For The

First District of Texas

 

 

____________

 

 

 class=Section5>

NO.
01-09-00618-CV

____________

 

 

 class=Section6>

CARRIE JORDAN, Appellant

 

V.

 

JERRY AND
PAMELA DOSSEY, Appellees

 



 



 

On Appeal
from the 387th District Court

Fort Bend
County, Texas



Trial Court Cause No.  08-DCV-167942

 



 




O P I N I O N

          In this termination of parental rights case, the biological
mother claims her child was kidnapped by the biological father, but the current
caretakers of the child call that claim “revisionist history.”  Agreeing that the
assertions by the biological mother lack credibility, the trial court rendered
judgment terminating the parental rights of appellant, Carrie Jordan, the
biological mother of R.A.  The trial court also appointed the
current caretakers of the child, appellees, Jerry and Pamela Dossey, as sole
managing conservators of R.A.  In this
accelerated appeal, Jordan contends in her first issue that the evidence is
legally and factually insufficient (1) to support termination under three
statutory grounds found in section 161.001(1) of the Texas Family Code, and (2) to support a finding that
termination of her parental rights is in the best interest of R.A.  See Tex.
Fam. Code Ann. § 161.001(1), (2) (Vernon
Supp. 2009).  If we
sustain the first issue, Jordan’s second issue requests that we remand the case
for the trial court to reassess its determination of conservatorship.  Because our review of the record shows the
evidence is legally and factually sufficient to support termination of Jordan’s
parental rights, we affirm.

Background

           Jordan is the
biological mother and James E. Akin is the biological father of R.A., who was
born on November 5, 2006.  Jordan had
custody of R.A. for the first three weeks of his life, but not since then.  Akin had custody of R.A. from the time R.A.
was three weeks until one year of age. 
R.A. has been cared for by the Dosseys for over two years since he
turned one year of age.  The evidence
presented at trial discussed (A) the events before R.A. was born, (B) the first
ten months of R.A.’s life from the time he lived with Jordan to the time
he lived with Akin, (C) the tenth through twelfth months of R.A.’s life when
Akin met Jerry Dossey and gave R.A. to him and his wife, and (D) the events
transpiring during the second and third years of R.A.’s life. 

A.              
The Events Before R.A. Was Born

Medical
records show that by age 15, Jordan had been sexually abused, diagnosed with
“major depression,” suffered from “psychiatric/substance abuse,” and had “10 to
15 suicide attempts”  by “drink[ing a] cleaning product, cutting and self-mutilation.”  At trial, Jordan denied that she had tried to
kill herself that many times, claiming she only tried to kill herself twice,
once as a teenager and once as an adult.  
At age 19, she was diagnosed with a seizure disorder.    

In January
2006, while enrolled in college, Jordan was sexually assaulted in her
apartment.  She dropped out of school and
moved into a shelter in Oklahoma City, Oklahoma.  After a few weeks at the shelter, Jordan met
Akin, became pregnant with R.A., and she quickly left the shelter to live with
Akin.

During the
first five months of her pregnancy with R.A., Jordan lived with Akin in a
transient lifestyle in “crack houses” and around criminals.  Jordan acknowledged that she could barely care
for herself during this period of time.   She observed that Akin was usually unemployed,
unable to keep a job, and unable to support her.  Within several months of meeting Akin, Jordan
learned he was a convicted sexual offender, although she claimed at trial she
did not know about that until much later. 
Jordan also learned he was a violent person.  Jordan stated that he struck her on at least
10 occasions while she was pregnant and that she knew this endangered R.A. when
he was a fetus.  Medical records document
that Jordan said that when she was pregnant, Akin pushed her, kicked her, and
punched her in the face.  While she was
pregnant with R.A., police officers had to frequently respond to what Jordan
described as “domestic” calls. 

During the
last four months of her pregnancy, Jordan lived in a shelter called the Rose
Home, which was run by Rhonda Davis.  The
Rose Home is a home for pregnant women with mental illnesses.  There, she received prenatal care, parenting
classes, and enrolled in a program that assists newborns.  When she initially moved into the Rose Home,
according to Jordan, Akin visited her often and was renovating a home for them
to move into, but according to Davis, Akin infrequently visited and appeared
uninterested in Jordan.    

While
eight months pregnant, Jordan attempted suicide with a broken mirror, requiring
her hospitalization in September 2006 at St. Michael’s Hospital.  At trial, Jordan denied that this was a
suicide attempt, explaining that she had only suicidal ideations caused by
Akin’s sudden failure to take her to the home he said he had renovated for them
and by her inability to contact him.  

Four of
the last six weeks of Jordan’s pregnancy were spent at Midwest Regional
Hospital.  According to Jordan’s trial
testimony, Akin visited her there once, and he told her that he had not
appeared earlier because he had been arrested for fighting and extradited to
another state.  After this single visit
by Akin in the final three months of Jordan’s pregnancy, Akin failed to appear
at the hospital when R.A. was born on November 5, 2006.  

B.              
The First Ten Months of R.A.’s Life

After
giving birth to R.A., Jordan returned to the Rose Home where she resided with
R.A.  Within two or three days of R.A.’s
birth, Davis took Jordan to the house where Akin was living on 7th Street.  Jordan showed R.A. to Akin, but Akin was not
interested in them.  According to Davis,
Akin refused to speak to Jordan as Jordan was “begging” him for attention.  

There is
conflicting testimony regarding Akin’s presence at the Rose Home and the
circumstances surrounding Akin’s removal of R.A. from the Rose Home.  The day after Jordan visited Akin, he may have
come to the Rose Home on November 12, 2006. 
Jordan’s trial testimony stated that he did, but her deposition
testimony was that he did not, and Davis’s testimony was that he did not.  Similarly, depending on which version of the
events is believed, Akin may have come to the Rose Home on the day before
Thanksgiving, which was November 24, 2006, and left with R.A., either with or
without Jordan’s consent.  Jordan
testified at trial that Akin “kidnapped” R.A. when he kept him without
permission following what was supposed to be a short trip to the grocery store
to pick up items for Thanksgiving dinner. 
In contrast, Jordan’s description to Special Agent Mike Phill was that R.A.
was taken by Akin when Akin left her a note or called her stating he was
keeping R.A.  Other evidence, however,
shows that Jordan gave R.A. to Akin for him to take care of because Jordan
hoped that his bonding with the child would help them reunite as a family.  Davis testified that when she saw that R.A.
was not with Jordan at the Rose Home, she offered to retrieve R.A. from Akin,
but Jordan told her everything was okay because Akin was good with
children.  Davis’s impression of the
situation was that Jordan wanted Akin to have R.A.  Davis’s impression was consistent with Akin’s
statements made in a letter to Jordan written much later after these
events.  Akin said he never wanted
possession of R.A. and was “stuck” with R.A. due to Jordan’s disappearance.

From
November 24, 2006, when Jordan claims R.A. went to live with Akin, to three
weeks later on December 16, when she was asked to leave the Rose Home, Jordan
resided at the Rose Home without R.A. 
Depending on which version of the events is believed, either she was
uninterested in taking R.A. from Akin or she was frantically searching for
them.  Davis described Jordan as not
wanting Davis’s assistance when Davis offered to take her to get R.A. from
Akin, explaining that Jordan appeared to want Akin to have R.A.  In contrast, Jordan’s trial testimony conveys
that she notified police officers, Legal Aid, and private attorneys.  Aside from her trial testimony, however, no
other evidence shows Jordan contacted anyone to seek custody of R.A. during
this period of time while she was living at the Rose Home. 

On
December 16, Jordan was asked to leave the Rose Home because Davis thought
Jordan was a “danger to herself . . . or others” after she made threatening
gestures with a knife.  Jordan
acknowledged that she was asked to leave the Rose Home, but she minimized the
reason, stating all she did was slam the dishwasher door.  

When she
left the Rose Home on December 16, Jordan immediately walked 24 blocks to the 7th
Street address where Akin was living with R.A., and had a seizure while arguing
with Akin.  According to Jordan’s trial
testimony, Akin walked out of the house holding R.A., walked back into the
house, handed R.A. to someone inside the house, and walked out of the house
empty handed, refusing to give her R.A. 
Jordan later told medical personnel who were treating her that she saw
R.A. had crusted blood under his nose and bruises.  Following the seizure, Jordan was taken by
ambulance to University of Oklahoma (OU) Medical Center, where she was quickly committed
involuntarily when she tried to commit suicide by hanging herself there.  She was in the OU hospital from December 16
to 21 of 2006, then either in a shelter or homeless
from December 22 to 28 in 2006, and then hospitalized again from December 28,
2006 to January 17, 2007 at Midwest Regional Medical Center (Midwest) for
“major depressive disorder, recurrent, severe with suicidal thinking psychotic features[,]” psychosis, borderline personality disorder, as
well as other conditions.  

During
this month, from December 16, 2006, to January 17, 2007 when Jordan was
hospitalized for her suicide attempt and suicidal ideations, depending on which
version of the events is believed, either Akin held R.A. with Jordan’s consent
or Akin continued to possess R.A. without Jordan’s permission.  Jordan’s statements contained within the
medical records for this period of time vary from day to day concerning whether
she was claiming then that R.A. was kidnapped, or claiming that R.A. was with
his father under her consent.  For
example, Jordan testified that she tried to get assistance from the police who
refused to help her, but medical records show Jordan was “considering” calling
the police.  Jordan also testified she
contacted Legal Aid and private attorneys, but the medical records are silent
concerning any efforts by her to contact Legal Aid and private attorneys.

Based on
some of Jordan’s statements about Akin’s possession of R.A. to the medical
personnel who were treating her when she was admitted into the OU Medical
Center on December 16, the personnel contacted the Oklahoma Department of Human
Services (DHS).  The medical records show
DHS quickly investigated the situation by going to Akin’s house and speaking to
Akin.  The medical records document that
DHS determined R.A. was not at risk, and closed the investigation on January
10, 2007.  After the case was closed on
January 10, other than Jordan’s trial testimony, the record shows no evidence
of contacts between Jordan and DHS or any other child welfare agency.

There is
also conflicting testimony regarding whether or not Jordan knew how to reach
Akin from January 10 through September 2007. 
Either Jordan did not know how to reach Akin after January 10 through
September 2007, or she knew where he was living and she was in communication
with him.  Jordan testified at trial that
Akin called her in July 2007 to ask that she mail R.A.’s social security card,
which she states she did because he threatened her.  Akin, however, in a letter written much
later, denied having any contact with Jordan who he said disappeared after she
gave him R.A.

After her
release from the hospital on January 17, 2007, Jordan resided at the Hope
Services Center Standers Estate for about nine months until September.  The center provided ongoing programs for
people released from the hospital on a mental health commitment.  Depending on which version of the events is
believed, either Jordan continued to look for Akin and R.A. for the first nine
months of 2007 and could not find them, or she knew where they were and
consented to the situation.  At trial,
Jordan described a nonconsensual situation where she searched for them, but
that version is different from the version she told to Detective
Feskanich.  In a statement to Detective
Feskanich, Jordan said that “when she was down at the Hope Center, she knew
that the child was still living at the residence.”  When the Detective asked her why she did not
make contact with Akin at that time, Jordan “never” gave him a “definite
answer” why she could not go there except that she had “curfew.” 

          Starting in the latter half of June 2007, after R.A. had
been gone over six months, the record shows documentation of minimal efforts by
Jordan to gain custody of R.A.  On June
20, 2007, Jordan asked Legal Aid for help, but it declined representation,
offering instead to draft all legal documents that would be required for Jordan
to petition the court for custody of R.A. 
Jordan decided not to represent herself and did not pursue the legal
action at that time.  Although she also
claimed at trial that in the “mid to late” summer of 2007 she contacted the Logan
County authorities regarding Akin’s status as a sex offender, no documents
verify this claim. 

In September 2007, Jordan moved out of the Hope Center and
into her own apartment after she received a lump sum disability payment
totaling between $6,000 and $7,000 from Social Security.  She acknowledged that she did not use the
money to hire an attorney to pursue legal action against Akin, but instead used
the funds to move into an apartment, pay off debts, and buy furniture.

C.              
The Tenth
through Twelfth Months of R.A.’s Life

When R.A.
was ten months old, Akin began work on September 26, 2007 for a company owned
by Jerry Dossey.  One day between October
11 and 23 of 2007, Akin asked Jerry for a ride to work.  When Jerry arrived to pick up Akin, Akin was
standing on a corner in front of a house holding several bags and R.A.  According to Jerry, Akin “stated that his
girlfriend had called the Department of Human Services on him for abuse of his
child and that they had came and cleared him and looked at the child and
released him.”  Jerry drove Akin to
another house where Akin left his belongings. 
Jerry described R.A. as dirty and “nonresponsive” with no emotion at
that time.

When Jerry
and Akin returned from a job on the road on October 29, 2007, Akin told Jerry
that he did not have anywhere to go, and Jerry paid for Akin to stay in a motel
for six nights until the next job on November 4.  While Jerry was driving Akin to the motel,
Jerry asked whether Akin wanted to pick up R.A. 
Akin said that R.A. was at the babysitter’s house and that he did not
want to see R.A.  After explaining that
he had seen Jerry with his adopted daughter, Akin asked him if he would like to
adopt R.A.  Akin told Jerry he had no
family who could take R.A. and that R.A.’s mother had committed suicide after
R.A. was born.  Jerry said he would have
to discuss it with his wife.  After a
meeting between the Dosseys and Akin, the Dosseys agreed to care for R.A. and
obtained a signed power of attorney from Akin on November 20, 2007.

R.A. was
living in a deplorable situation when the Dosseys rescued him soon after
obtaining the signed power of attorney. 
Akin had left R.A. with a person he called a “babysitter.”   The babysitter lived in a “crack house” that
was “covered in alcohol bottles,” “very dirty,” and “smelled
like feces.”  Jerry loaned Akin $150 to
pay the babysitter, who demanded the money in exchange for R.A.  R.A. was filthy, covered in human feces, and
his penis had fused to his scrotum causing his skin to peel off there.  R.A. had an “explosive” fear of taking a
bath.  R.A. did not cry or show
emotion.  When R.A. ate, he ate as much
as he could and then stored food in his mouth, which is a condition that occurs
when a child is irregularly fed.  A
medical examination of R.A. revealed he had scabies.

D.              
Events Transpiring the Second and
Third Years of R.A.’s Life

On
December 20, 2007, after the Dosseys began caring for R.A., Akin stopped
working for Jerry.  Although they could
not locate Akin for information, the Dosseys attempted to get a birth
certificate for R.A. and a death certificate for R.A.’s mother by trying to
obtain information from the babysitter where R.A. had been recovered, as well
as Akin’s ex-girlfriend Jessica. 
Information given by Jessica led Jerry to the Rose Home, where he
learned Jordan had been before she moved to the Hope Center.  Due to confidentiality, however, Jerry could
not obtain more information about Jordan or R.A.  Jerry spoke to a neighbor, Officer Phillip
Stewart who worked for the Harrah, Oklahoma police department.  Jerry gave Officer Stewart the names of
Jordan and R.A. to see if Stewart could find any information about them but
Stewart reported that he could not find Jordan in his records.     

          Around January 2008, as they were planning their move from
Oklahoma to Texas for a different employment opportunity for Jerry, the Dosseys
contacted an attorney in Texas to determine how to proceed to adopt R.A., in
light of the abandonment of the child by Akin and the suicide of R.A.’s
mother.  The attorney advised them to
wait six months before filing the case. 
The Dossey family moved to Sugar Land, Texas in April 2008. 

          Around the time the Dosseys took custody of R.A. in late
2007, Jordan contacted various police agencies in search of R.A., which led her
to Special Agent Mike Phill with the Minnesota police department in March
2008.  Soon after that, Jordan received a
telephone call in March 2008 that revealed information that led to her learning
that the Dosseys had possession of R.A. 
More specifically, in March 2008, Jerry Dossey’s mother contacted
Jordan’s parents, but did not identify herself. 
She asked if Jordan was still alive and various questions regarding
Jordan and her relationship with Akin. 
The number was registered to Bill Sibley, Jerry’s father.  Jordan’s parents told Jordan about the call
and gave her the number.  Jordan called
Jerry’s mother, but could not find out any information.  Jordan then contacted Special Agent Phill,
who contacted various police agencies.   

In August
2008, Akin was found at a shelter in New York City and charged for failing to
register as a sex offender.  When
questioned by New York police detectives regarding the location of R.A., Akin
refused to answer questions and referred them to his attorney.  The detectives, however, did discover there
was a connection between the Dosseys and Akin, and contacted Special Agent
Phill.  Special Agent Phill learned the
Dosseys had moved to Sugar Land, Texas.  Special
Agent Phill then requested that Detective Feskanich meet with Jordan so that
Oklahoma could open a Missing and Exploited Children case because R.A. had
never been reported as missing in Oklahoma.

Detective
Feskanich testified that his first involvement in this case concerning
R.A. was in September 2008, when Jordan made a report of a missing child to the
Oklahoma City Police Department.  Feskanich
searched to see if a prior missing child report for R.A. had been filed and
found none.  He explained that if someone
had claimed a child was in danger, he believed a police report would have been
generated.  Detective Feskanich contacted the
Dosseys and told them to take R.A. to the Sugar Land police department where
R.A. could be checked and verified as safe and healthy.  The Sugar Land police allowed R.A. to remain
with the Dosseys after verifying he was safe. 
Detective Feskanich learned that the Dosseys had hired an attorney to
facilitate an adoption and that they intended to keep R.A.  Detective Feskanich and Special Agent Phill
reported that they were satisfied that R.A. was in a “clean, loving home” and
the Detective instructed Jordan that she needed to file a case in a court in
Texas to have a judge determine custody.

          According to Jerry, he and his wife first found out on
September 4, 2008 that Jordan was alive. 
Prior to that time, he had no suspicion that she was alive.  Jerry testified that he did not
have any knowledge of any contact that occurred between his mother and Jordan’s
mother, explaining he was upset about learning about the contact during
discovery in this lawsuit, and maintaining that he did not know Jordan was
alive until he learned about it in September 2008. 

Around the
time R.A. turned two years of age in November 2008, Jordan obtained pro bono
counsel and sued to establish sole conservatorship of R.A.  The Dosseys responded to Jordan’s suit by
filing a petition seeking sole conservatorship, termination of Jordan’s and
Akin’s parental rights, and the right to adopt R.A.  

The trial court held a bench trial that lasted six days.  It heard testimony from the Dosseys,
Detective Feskanich, Special Agent Phill, Davis, Jordan, an amicus attorney,
and Janie Cravens, a licensed social worker who testified that it would be in
the child’s best interest to remain with caretakers with whom the child has
bonded.  The trial court terminated
Akin’s parental rights by entering a default judgment.  The trial court also terminated Jordan’s
parental rights after finding that termination of the parent-child relationship
was in the best interest of R.A., and that she committed three grounds under
section 161.001(1) by leaving R.A. alone or in the possession of another
without providing adequate support and remaining away for a period of at least
six months (section C); knowingly placing or allowing R.A. to remain in
conditions or surroundings that endanger his physical or emotional well-being
(section D); and engaging in conduct or knowingly placing R.A. with persons who
engaged in conduct that endangers his physical or emotional well-being (section
E).[1]  The court then appointed the Dosseys as
managing conservators.  Jordan filed a
motion for new trial and a motion for a judgment notwithstanding the
verdict.  The court denied both motions
and signed findings of fact and conclusions of law.  Jordan appealed the trial court’s
determinations but Akin did not. 

Standard of Review

A parent’s
rights to the “companionship, care, custody, and management” of his or her
children are constitutional interests “far more precious than any property right.”  Santosky v. Kramer,
455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); see In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  A termination decree is complete, final,
irrevocable, and divests for all time that natural right as well as all legal
rights, privileges, duties, and powers with respect to each other except for
the child’s right to inherit.  Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985). 
Termination proceedings should be strictly scrutinized, and the
involuntary termination statutes should be strictly construed in favor of the
parent.  Id. However, “the rights of natural parents are not absolute” and
“the rights of parenthood are accorded only to those fit to accept the
accompanying responsibilities.”  In re A.V., 113 S.W.3d
355, 361 (Tex. 2003).  Recognizing
that a parent may forfeit his or her parental rights by their acts or
omissions, the primary focus of a termination suit is protection of the child’s
best interests.  Id.  

Proceedings
to terminate parental rights under the Family Code require proof by clear and
convincing evidence.  Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2009); In re J.O.A., 283 S.W.3d 336, 344 (Tex.
2009).  Clear and
convincing evidence is “proof that will produce in the mind of the trier of
fact a firm belief or conviction as to the truth of the allegations sought to
be established.”  In re J.O.A., 283 S.W.3d at 344.   When the legal sufficiency of the evidence is
challenged, a court should look at all the evidence in the light most favorable
to the finding to determine whether a reasonable trier of fact could have
formed a firm belief or conviction that its finding
was true.  Id.  To give appropriate
deference to the factfinder’s conclusions, looking at the evidence in the light
most favorable to the judgment means that a reviewing court must assume that
the factfinder resolved disputed facts in favor of its finding if a reasonable
factfinder could do so.  Id. 
A corollary to this requirement is that a court should disregard all
evidence that a reasonable factfinder could have disbelieved or found to have
been incredible.  Id.  This does not mean that
a court must disregard all evidence that does not support the finding.  Id.  Disregarding undisputed facts that do not
support the finding could skew the analysis of whether there is clear and
convincing evidence.  Id. 
If, after conducting its legal sufficiency review of the record
evidence, a court determines that no reasonable factfinder could form a firm
belief or conviction that the matter that must be proven is true, then that
court must conclude that the evidence is legally insufficient.  Id. at 344–45.

When the
factual sufficiency of the evidence is challenged, only then is disputed or
conflicting evidence under review.  Id. at 345.  If,
in light of the entire record, the disputed evidence that a reasonable
factfinder could not have credited in favor of the finding is so significant
that a factfinder could not reasonably have formed a firm belief or conviction,
then the evidence is factually insufficient. 
Id.  

Credibility of Witnesses

Because
the credibility of witnesses is a matter pertinent to each of the grounds for
termination, we begin by addressing the trial court’s findings that the trial
testimony by Jordan lacked credibility and the trial testimony by the other
witnesses who testified either at trial or by deposition was credible.

The trier
of fact is the sole judge of the credibility of the witnesses and the weight to
give their testimony.  See City of Keller v. Wilson, 168 S.W.3d
802, 819 (Tex. 2005).  When there
is conflicting evidence, it is the province of the trier of fact to resolve
such conflicts.  See id. at 820.  In every circumstance in which a reasonable
trier of fact could resolve conflicting evidence either way, the reviewing
court must presume it did so in favor of the prevailing party, and disregard
the conflicting evidence in its legal sufficiency review.  See id.
at 821.  If
the evidence at trial would enable reasonable and fair-minded people to differ
in their conclusions, then the trier of fact must be allowed to do so.  See id.
at 822.  So long
as the evidence falls within this zone of reasonable disagreement, we may not
substitute our judgment for that of the trier-of-fact.  See id.  

  In its finding of fact number eight, the
trial court stated, “The testimony by Carrie Jordan as presented at trial was
inconsistent and not credible.”  The
record shows Jordan’s trial testimony is often inconsistent with the testimony
of other witnesses, documents in evidence, and her own former statements.  In the following section we examine for
credibility her assertions that pertain to each of the grounds for termination
found by the trial court.  Jordan claims
(A) her mental condition escalated when her relationship with Akin suddenly
changed when Akin failed to arrive in September 2007 to take her to the house
he had renovated for her, (B) she never consented for R.A. to be initially
placed with Akin, and (C) even if she did initially consent for R.A. to be
placed with Akin, she did not consent for R.A. to remain with Akin beyond that
initial period of time.  The trial court found
these contentions lacking in credibility, and we conclude in section (D) that
the record supports the trial court’s credibility determination.

A.      Change
in Mental Condition Due to Change in Relationship

According
to Jordan’s trial testimony, she started having suicidal ideations when Akin
suddenly failed to appear in September 2007 after telling her that he had
renovated a house for them to move into together as a family.  For several reasons, the record does not
support that theory.

First, at
trial, Jordan paints a picture of surprise at Akin’s failure to appear when he
said he would, suggesting that their relationship was fine before that.  It is undisputed,
however, that Jordan started living in the Rose Home, a shelter for pregnant
women with mental illnesses, because Akin was unemployed and unable to support
them.  During the period of time Jordan
lived with Akin while she was pregnant, they did not have a permanent
residence.  At times, they lived in
“crack houses.”  At other times, they
moved from house to house because Akin would get into an altercation with
someone where they were staying and they would then be required to leave the
residence.  In describing Akin, Jordan
said he “always liked to live in neighborhoods where there were severe drug
problems and prostitution.”  A
handwritten note by Jordan stated, “While I was pregnant, James did not work,
or if he did, he didn’t hold a job very long.” 
She acknowledged that while she was with Akin when she was pregnant she
did not receive proper nutrition due to their instability.  The undisputed evidence shows Jordan was
aware of Akin’s financial and personal instability.

Second,
Jordan’s trial testimony suggests that after she moved into the Rose Home, Akin
was interested in pursuing a relationship with her and her baby and visited her
often, so that she was surprised by his failure to pick her up to take her to
their renovated home.  But according to
Davis, Akin did not visit often and appeared uninterested in Jordan.  Deferring to the trial court’s credibility
determinations, the record shows Akin did not want to have a relationship with
Jordan.

Third,
medical records show Jordan has a long history of suicide attempts, having attempted
suicide at least 10 to 15 times before she became pregnant with R.A.  At trial, Jordan denied having attempted to
commit suicide that many times, but the trial court found that testimony
lacking in credibility.  Deferring to the
trial court’s credibility determinations, Jordan had frequent suicide attempts
throughout her life.

Fourth,
although she acknowledges she knew Akin had certain faults, she denied at trial
that she knew he was a convicted sex offender during the period of time when
she was pregnant, and claims instead that she learned this information about
Akin much later.  Jordan presents this
picture to explain her surprise at things she found out later about Akin.  The record does not support this
version.  Aside from her trial testimony,
the record shows that Special Agent Phill wrote in a 2008 report that Jordan
told him, “[she] first became aware [that] Akin was a registered sex offender
after a verbal domestic argument on May 2, 2006 . . . .”  At trial, Special Agent Phill further testified
by deposition that Jordan told him “that the first time she found out that he
was a registered sex offender was after they had a domestic altercation.”  The trial court could reasonably have
determined that Jordan knew Akin was a convicted sex offender at the time of
the domestic altercation when she was pregnant with R.A.  

Although
at trial Jordan presents a picture of a person shocked by the sudden
disappearance of a person who she then called a “husband,” the trial court
could reasonably have rejected that testimony as lacking in credibility.  The trial court could have reasonably
determined from the evidence it found credible that Jordan was not surprised by
Akin’s failure to renovate a house for them because he had no financial means
to renovate a house, he was too personally unstable to commit to that type of
task, and he was not interested in pursuing a relationship with her.  Furthermore, Jordan knew that Akin was not reliable  because he
was often kicked out of houses where he would try to stay, he was often
arrested, and he was a convicted sex offender. 
The trial court could reasonably have rejected Jordan’s explanation
about the attempted suicide in September 2007 when she was eight-months
pregnant with R.A. as lacking in credibility.

B.      Initial
Placement of R.A. with Akin

Jordan
contends that she did not knowingly place R.A. with Akin because Akin initially
took R.A. from her without her consent. 
In this section, we focus on a three-week period of time when R.A.
initially began living with Akin from about November 24, 2006, when Jordan
states Akin took R.A. just before Thanksgiving, to December 16, when Jordan was
ousted from the Rose Home. 

The sole
evidence that Akin’s initial possession of R.A. was without Jordan’s consent
comes from Jordan’s trial testimony that the trial court determined lacked
credibility.  Excluding her trial
testimony from consideration, and deferring to the trial court’s determination
about the credibility of the evidence, the record shows that Jordan voluntarily
relinquished R.A. to Akin, who did not want a relationship with them.  From the time of R.A.’s birth, Akin was not
interested in him.  Akin did not go to
the hospital when R.A. was born, and when Davis took Jordan to see Akin within
a few days of R.A.’s birth, Jordan was “begging” him for attention.  Akin did not come to see Jordan at the Rose
Home at any point after R.A.’s birth.  

The trial
court expressly found in its findings of fact number six that Jordan “did not”
ask Akin “to return the child to her at that time,” referring to December
2006.  The trial court also found that
Jordan told Davis that R.A. was “‘okay’ with his father.”  The record shows Davis suggested to Jordan
that she should take R.A. back from Akin; however, Jordan “assured [her] that
it was okay, that [Akin] - - no matter how he was with her, he was very good
with children.”  Davis testified that
although her memory of the conversation was not completely clear, she knew “for
a fact that [she] encouraged [Jordan] to bring the baby back and [Jordan] was
reluctant to do so.”  Davis further
stated, “[Jordan] seemed to want [Akin] to have the baby.”  Davis said it appeared to her that Jordan
wanted Akin to have R.A. so that they could reunite as a family.  Davis’s recollection about Akin’s lack of
interest in R.A. is supported by Akin’s version of the events.  The letter from Akin to Jordan mentions that
Akin did not want to have custody of R.A. but was “stuck” with him when Jordan
refused to care for R.A. and disappeared. 


Jordan
contends her actions to regain custody of R.A. after R.A. began to live with
Akin show that she did not consent to the situation.  Jordan claims that soon after R.A. began
living with Akin, in the period of time from late November to December 16,
2006, she contacted police officers, Legal Aid, and private attorneys, and
tried to raise funds to hire an attorney. 
Other than Jordan’s trial testimony, no evidence shows she contacted the
police, Legal Aid, or attorneys, or tried to raise funds to hire an
attorney.  More specifically, Officer
Feskanich testified that he could not find any report concerning R.A., which he
would expect would have been generated if someone had complained that a child
was in danger.  Legal Aid responded to Jordan’s
June 2007 request for assistance, which is the only evidence in the record
concerning any contact between them and Jordan. 
Concerning Jordan’s trial testimony that she tried to contact private
attorneys and tried to raise funds to hire an attorney, no evidence shows this,
other than her trial testimony. 
Furthermore, Davis testified that Jordan was not interested in going to
retrieve R.A. and it appeared to Davis that Jordan consented to Akin’s
possession of R.A.  

Although
she refers to her statements in medical records calling the case a kidnapping,
other statements in those same medical records contradict that position.  Jordan’s reaction to Akin’s initial
possession of R.A. was described by Jordan herself, as recorded in a medical
record dated December 28, 2006, which states, 

She has delivered her young son in November of this
year and there has been some difficulties with her ability to keep the child.  She had been staying at the Rose Home with
the infant, but states that she got angry there and was asked to leave the Rose
Home.  As such, she was unable to keep her young son, so her husband currently
has the child and is living with a family that she is unable to live with as
they do not want her there.  She
states, “They think I am crazy.”  

 

(Emphasis added.)  Deferring to the trial court’s credibility
determinations, the record shows Jordan voluntarily placed R.A. with Akin in
late November to December 16, 2006.

C.      Allowing R.A. to Remain with Akin 

          In this section, we address the
period of time from December 16, 2006 to September 2007.

1.       Jordan
Spent Approximately 25 Days Seeking Assistance from DHS from December 21, 2006
to January 10, 2007 

 

The
medical records document that Jordan was in communication with DHS workers from
December 21, 2006 to January 10, 2007. 
On December 21, 2006, the medical records show that Jordan was
“concerned about child’s welfare and in touch with multiple people regarding
her child.”  The record also states that
Jordan “had a child welfare employee come visit her.”  Medical records dated January 10, 2007 state,

[DHS] investigator says that the father does live with
roommates, has no job, but the house and circumstances meet appropriate
environmental standards for the child. 
At this time, the investigator says that she is finished with both
parties and patient does not need to keep contacting her.  She has an open case, but no further action
will be taken. 

 

The medical records show
that the DHS worker said that Akin stated he did not want to be with Jordan
because he could not handle her “destructive behavior.” 

Jordan
suggests that her contact with DHS shows she did not allow R.A. to remain with
Akin, but the record fails to support that assertion.  Instead, the records show Jordan was focused
on obtaining DHS’s assistance to find her a place to live with Akin and
R.A.  The medical records for this period
of time show that Jordan was attempting to have DHS intervene to help find a
place for Jordan, Akin, and R.A. to live together as a family.  The medical records show Jordan “want[s] the
case worke[r] to help us find a place where we can
all be together, a place for families.  I
don’t want my baby or us on the street, especially one week before the
holidays.”  Another
medical record states, “She also wanted to talk to social worker so that
a placement can be found for her husband and her . . . .”  The medical reports also document that Jordan
was “vague, unclear about why [Jordan] cannot be with husband and child.”  Furthermore, the medical records for January
5, 2007 state,

Patient wanting to talk with her
husband to check on their baby and to see if he will pick up her and the baby’s
belongings at the shelter where she was staying.  Reports he
told her he had brought her a new wedding ring. 
Reports she really does not know what he is thinking but hopes he is
sincere in working towards them being a family together.

 

          When DHS became involved, its concern was to determine
whether Akin had a suitable environment for R.A.  Nothing in the record indicates that Jordan
told DHS that she had seen blood and bruises on R.A., that Akin had been
physically abusive towards her when she was pregnant with R.A., or that Akin
was a convicted sex offender.  Having no
information about Akin’s history and requests focused on having them find a
place for Jordan to live with Akin and R.A., DHS decided to take “no further
action” after its snapshot view of Akin’s residence and circumstances.

At most,
Jordan has shown that she was in contact with DHS for a 25-day period of time
and that DHS found that R.A.’s living situation was suitable during that short
period they were involved.  The trial
court could reasonably have determined that this contact with DHS was
inconsequential in this case because Jordan did not give DHS the pertinent
information about Akin’s background and its assessment was based on a snapshot
view of R.A.’s circumstances.

          Additionally, after January 10, 2007, when Jordan learned
DHS would take no further action, Jordan made no effort to have DHS further
investigate Akin.  Jordan acknowledged at
trial that she believed the DHS worker’s assessment was erroneous, and that she
believed Akin had R.A. in a “bad environment.” 
Jordan testified at trial that although the DHS worker reported that
R.A. was not in danger with Akin, Jordan disagreed with that conclusion.  Although she did not believe “it was a good
investigation,” Jordan took no further steps to pursue another DHS
investigation and never contacted DHS again after January 10, 2007.  This was unreasonable because Jordan knew
that, at best, DHS got a snapshot view of R.A.’s environment, which would
likely change within a short period of time, given that Akin was a transient,
usually unemployed, usually ejected from the places he lived, violent, a
convicted sex offender, unreliable, uninterested in having a relationship with
R.A., and could not provide proper nutrition to those in his care.  The trial court could reasonably have
determined that Jordan knew the DHS investigation was inadequate because she
did not give the worker pertinent information for her to make an accurate
assessment and Akin’s transient lifestyle would produce a different environment
for R.A. within a short period of time.

2.       After DHS
Ended Its Investigation, Jordan Knowingly Allowed R.A. to Remain with Akin from
January 10 to September 2007

    

Jordan
contends that after DHS ended its investigation on January 10, Akin continued
to have R.A. without her consent from January 10 to September 2007.  She points to medical records that include
her references to Akin’s possession as a “kidnapping” and claims that she made
efforts to regain custody of R.A. during that period of time.

In the trial court’s
seventh finding, the court found:

 

Prior to March 2008, there was no evidence offered by
[Jordan] that she earnestly attempted to locate or retrieve the child after
relinquishing him to [Akin] in November 2006 despite being advised to do so and
despite offers of help to do so from Oklahoma Legal Aid.

 

The record
supports the trial court’s finding that Jordan did not earnestly attempt to
locate or retrieve R.A, but it does not support the date of March 2008 and
instead it supports the earlier date of September 2007 when Jordan began
calling various police agencies.  We have
already discussed the period of time from approximately November 24, 2006, when
R.A. began living with Akin, to January 10, 2007, when DHS was involved in the
case.  We, therefore, focus on the period
of time when R.A. remained with Akin from January 10, 2007, when DHS ended its
investigation, to September 2007, when Jordan contacted several police agencies
inquiring about R.A.  In examining the
period of time from January 10 to September 2007, we examine Jordan’s (a)
medical records, (b) assertions that she contacted police (c) reasons for not
pursuing a civil lawsuit, and (d) assertion that she did not know where Akin
was. 

 

a.       Medical
Records

Although
Jordan asserts the medical records support her position that Akin had R.A.
without her consent for the period of time before September 2007, her
statements in the medical records are inconsistent.  Jordan’s statements documented in the medical
records range from one extreme, in which she claims Akin kidnapped R.A., to the
opposite extreme, in which she states that Akin is nice, that he is taking care
of R.A. while she is unable, and that she wants case workers to help find a
place for Akin, Jordan, and R.A. to live together as a family.  For example, in the same emergency report
where Jordan uses the word “kidnapped,” she quickly explains that Akin
“threatened to go to court and get custody” and that he would get a protective order, which are both actions that appear to be
inconsistent with a kidnapping.  

After DHS
ended its investigation of Akin, the medical records suggest Jordan consented
to Akin having possession of 
R.A.  OU medical records
dated January 14, 2007 state, “She did write a letter to her husband asking
that he bring her 3 mo[nth] old son to see her.  Also told him she did not like where her
husband is living. . . .   She describes
her mood as ‘great . . . I’ve never felt this good in my life.’”  The medical records contain inconsistent
statements concerning whether Akin’s possession of R.A. was with or without
Jordan’s consent.  We, therefore, must
defer to the trial court’s determination that Jordan knowingly and voluntarily
let R.A. remain with Akin.   

b.      Contact
With Police

The
medical records show that on January 9, 2007 Jordan said she was
“contemplating” calling the police.  The
record next states, “When asked for what reasons is she justified in calling
the police, she didn’t say and changed the subject.  [The writer of the note] offered to help in
any way.”  Nothing in the medical records
show Jordan made contact with police when she was hospitalized.

Jordan
contends that in “mid to late” summer of 2007 she contacted Logan County
authorities, who informed her Akin was a noncompliant sex offender who had
failed to register in Minnesota, and then she contacted the Oklahoma police,
who sent Officer Robert Townsend to meet her at the Standers Estate.  Other than her trial testimony, no evidence
shows she contacted these authorities at this point in time.  Special Agent Phill testified that when he
first came into contact with her in March 2008, he spoke to Oklahoma City
police officers who did remember talking to her, but he did not specify when
that contact between Jordan and those officers occurred.  According to Detective Feskanich, the first
report to the Oklahoma police was in January 2008.  Feskanich testified that he believed that if
Jordan had tried to contact the police before January 2008, the police would
have generated a report because a report would be made if a child were in
danger.  Other than Jordan’s claims at
trial that she contacted the police who refused to assist her, no other
evidence in the record supports her position that she contacted any police agency
prior to September 2007.  Based on its
credibility assessment of the evidence, the trial court could reasonably have
determined Jordan did not seek police assistance until September 2007.

c.       Reasons for Not Pursuing Civil
Lawsuit  

          Jordan asserts she sought to retain an attorney but could
not afford one during that period of time. 
The only evidence to support that claim is Jordan’s trial testimony.  Nothing in the medical records mentions
Jordan trying to hire an attorney. 
Moreover, evidence that Jordan received a lump sum disability payment
late in the summer of 2007 and spent the money on things such as furniture is
strong impeachment of Jordan’s claim that her lack of an attorney was due to a
financial inability.  

Jordan
contends she tried to obtain R.A. by seeking the assistance of Legal Aid during
the first seven months of R.A.’s life.  In June
2007, Legal Aid sent a letter declining representation.  This document is the sole evidence about Jordan’s
contact to Legal Aid, aside from her testimony at trial.  However, for two reasons, the trial court
could reasonably have determined that Jordan’s actions in June 2007 were not
earnest attempts by her to locate or retrieve R.A.  First, Jordan refused the assistance from
Legal Aid.  Legal Aid offered to draft
all documents that would be required for Jordan to petition the court for
custody of R.A.  Jordan testified that
she did not sign the contract for these services because she did not think she
should represent herself.  Although
self-representation is usually unwise, Jordan was offered some limited legal
assistance by Legal Aid to assure that the paperwork would be adequate.  Jordan opted to do nothing rather than accept
some help to regain custody of R.A.  

Second, shortly after Legal Aid had offered to draft the
paperwork for Jordan, she received almost $7,000 in a lump sum disability
payment that she decided to use for material things other than pursuing legal
action.  In light of Jordan’s decision
not to pursue legal action when she had the funds to do so, the trial court
could reasonably have determined based on its credibility assessment of the
evidence that the reason Jordan did not pursue the lawsuit in the summer of
2007 was because she did not desire to obtain custody of R.A. at that time, and
not because she was denied complete representation by Legal Aid.

d.      Ability
to Locate Akin

Jordan
contends she did not knowingly allow R.A. to remain with Akin because she did
not know where Akin was after DHS closed its case in January 2007.  The record does not support that contention.  

The
medical records show that Jordan knew where Akin was living in January
2007.  Jordan gave DHS Akin’s address,
where they found him around January 10. 
On January 14, according to medical records, Jordan said she wrote a
letter to Akin asking him to bring R.A. to see her and telling him that she did
not like where he was living.  These same
medical records show that on January 17 Jordan stated that Akin resided “in a
home off of 7th and McKinley in Oklahoma City and fears that this home is
conducive to illicit drug activity.”  

The record
shows Jordan knew how to find Akin in the first seven months of 2007.  Jordan testified at trial that she
communicated with Akin in July 2007 when he asked her to mail him R.A.’s social
security card, which she says she did.  Detective Feskanich’s testimony is consistent with that
evidence.  He said that when he
interviewed Jordan in January 2008, she told him that when she was living at
the Hope Center, she knew where Akin and R.A. had been living in Oklahoma
City.  Jordan told Detective Feskanich
that the reason she did not go and make “contact” with Akin and R.A. was
because she “had curfew.”  The trial
court could reasonably have determined that Jordan’s claim that she did not
know where Akin was after January 2007 lacked credibility.

Through
its assessment of the credibility of the evidence, the trial court could
reasonably have determined Jordan voluntarily and knowingly allowed R.A. to
remain with Akin by deciding not to earnestly attempt to retrieve R.A. from
January 10 to September 2007.

D.      Record
Supports Trial Court’s Credibility Determination

In light of Jordan’s many inconsistencies in the various
versions of the events, the trial court’s finding that Jordan’s trial testimony
lacked credibility is supported by the record, and we must defer to that
determination.  See id.  Although the trial
court disbelieved Jordan, it found the other witnesses credible.  The witnesses were Jerry and Pam Dossey;
Cravens, the expert; Davis, the manager of the Rose Home; Detective Feskanich; and
Special Agent Phill.  From our review of
the record, the trial court’s finding that these witnesses were credible is
within the zone of reasonable disagreement, and therefore we defer to the trial
court’s determination.  See id. 
In reviewing each of the grounds for termination of Jordan’s parental
rights found by the trial court, we do so under the prism of its findings of
credibility of the witnesses.

Statutory Grounds for Termination

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the Texas Family Code, the party wishing to terminate rights must
establish two things.  First, the party
must prove that one or more acts or omissions enumerated in one or more of the
subsections of section 161.001(1) occurred. 
See Tex. Fam. Code Ann. § 161.001(1); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005); Liu v. Dep’t of Family and Protective Servs., 273 S.W.3d 785, 790 (Tex. App.—Houston
[1st. Dist.] 2008, no pet.).  Second, the
party must prove that termination of the parent-child relationship is in the
best interest of the child.  See Tex.
Fam. Code Ann. §161.001(2);
In re J.L., 163 S.W.3d at 84; Liu, 273 S.W.3d at 790.  In termination proceedings, the fact finder
must find that both elements are established by clear and convincing
evidence.  Tex. Dep’t of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).  Termination may not be based
solely on the best interest of the child. 
Id.; Liu, 273 S.W.3d at 790.  

Grounds for Termination Under Section 161.001(1)

Jordan
challenges the legal and factual sufficiency of the evidence to support each of
the three grounds found by the trial court under section 161.001(1).  See
Tex. Fam. Code Ann. § 161.001(1).  The trial court determined that Jordan
violated sections C, D, and E of section 161.001(1).  See Tex. Fam. Code § 161.001(1)
(C), (D), & (E).  We address each section separately.  Although termination may be based on the best
interest of the child in addition to one ground under section 161.001(1), we
conclude the evidence is legally and factually sufficient for each of the three
grounds found by the trial court.  

A.      Endangering
by Placing or Allowing Conditions (Section D)

          1.       Applicable Law

The trial
court may order termination of the parent-child relationship if it finds by
clear and convincing evidence that the parent has knowingly placed or knowingly
allowed the child to remain in conditions or surroundings which endanger the
physical or emotional well-being of the child. 
Tex. Fam. Code Ann. § 161.001(1)(D)
(Vernon Supp. 2009).  Inappropriate,
abusive, or unlawful conduct by persons who live in the child’s home or with
whom the child is compelled to associate on a regular basis in the home is a
part of the “conditions or surroundings” of the child’s home under section D.  In re C.L., No. 2-09-126-CV, 2009 WL 3078588, at *2 (Tex. App.—Fort
Worth Sept. 24, 2009, no pet.) (mem. op., not
designated for publication).  When
termination of parental rights is based on section D, the endangerment analysis
focuses on the evidence of the child’s physical environment, although the
environment produced by the conduct of the parents bears on the determination
of whether the child’s surroundings threaten his well-being.  In re S.M.L., 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.]
2005, no pet.).  Section D permits
termination if the petitioner proves parental conduct caused a child to be
placed or remain in an endangering environment. 
In re R.D.,
955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).  

It is not
necessary that the parent’s conduct be directed towards the child or that the
child actually be injured; rather, a child is
endangered when the environment creates a potential for danger which the parent
is aware of but disregards.  In re S.M.L., 171 S.W.3d
at 477.  Conduct that demonstrates
awareness of an endangering environment is sufficient to show
endangerment.  Id. (citing In re Tidwell,
35 S.W.3d 115, 119–20 (Tex. App.—Texarkana 2000, no pet.) (“[I]t is not
necessary for [the mother] to have had certain knowledge that one of the
[sexual molestation] offenses actually occurred; it is sufficient that she was
aware of the potential for danger to the children and disregarded that risk by
. . . leaving the children in that environment.”)).  In considering whether to terminate parental
rights, the court may look at parental conduct both before and after the birth
of the child.  Avery v. State, 963 S.W.2d 550, 553
(Tex. App.—Houston [1st Dist.] 1997, no pet.).  Section D permits termination based upon only
a single act or omission.  In re R.D., 955 S.W.2d at
367.

          2.       Analysis

Deferring
to the trial court’s credibility determinations, Jordan caused several
circumstances that physically and emotionally endangered R.A. by placing him
and allowing him to remain in the sole care of Akin.  First, she knew that Akin was violent,
abusive, had endangered R.A. as a fetus when Akin physically abused her, and
was often incarcerated for violent conduct. 
See In re J.M.M., 80 S.W.3d
232, 241–42 (Tex. App.—Fort Worth 2002, pet. denied) (holding evidence legally
and factually sufficient under sections D and E to terminate mother’s parental
rights based in part on evidence that mother placed children with physically
abusive father).  

Second,
Jordan knew Akin was a convicted sex offender, who usually lived near criminals
and drug addicts, and who lived a transient lifestyle.  See id.
(holding evidence legally and factually sufficient under sections D and E
to terminate mother’s parental rights based in part on evidence that mother
placed children with father, who lived transient lifestyle with children); Hann v. Tex. Dep’t of Protective &
Regulatory Servs., 969 S.W.2d 77, 82–83 (Tex. App.—El Paso 1998, pet.
denied) (holding evidence legally and factually sufficient under sections D and
E to terminate mother’s parental rights based in part on evidence that mother
endangered child’s physical and emotional well-being by leaving child alone
overnight with known cocaine abusers).  

Third,
Jordan knew Akin was not interested in having a relationship with R.A., would
not provide adequate nutrition for R.A., and had no means to financially
support R.A. due to Akin’s perpetual unemployment.  See In
re T.T., 39 S.W.3d 355, 362 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (holding evidence supported terminating mother’s parental
rights under section D based in part on evidence that mother could not
adequately protect or provide financially for children).

          There is sufficient evidence that shows Jordan was aware of
the potential for the environment to endanger R.A.  See
In re S.M.L., 171
S.W.3d at 477.  Although section D
does not require proof of actual harm, the evidence here shows R.A. was
actually harmed by living in the circumstances provided by Akin after Jordan
voluntarily relinquished custody of R.A. to Akin.  The trial court found that when Jerry took
R.A. to live with him, R.A. was found alone in a residence, in deplorable
conditions, with no clothing or personal belongings, covered in feces, with his
penis fused to his scrotum, covered in scabies, with developmental delays, a
Vitamin D deficiency, no ability to crawl or walk, suffering from night
terrors, afraid of the bath tub and water, demonstrating sexually explicit
behaviors, and unable to speak.  Although
she may not have known that R.A. would get these particular injuries from the
circumstances of placing R.A. with Akin, Jordan knew that these types of
injuries or much worse were the probable result of the circumstances of leaving
a baby in the custody of Akin.  See id.    

The single
act of placing R.A. with Akin under any of these circumstances permits
termination under section D.  See In
re R.D., 955 S.W.2d at 367.  Here, however, the evidence shows that Jordan
not only placed R.A. in these circumstances, but she voluntarily and knowingly
allowed R.A. to remain in the circumstances without making any earnest effort
to remove him from them.   

          3.       Conclusion

Viewing
all the evidence in the light most favorable to the judgment, we hold a
fact-finder could reasonably have formed a firm belief or conviction that
Jordan knowingly placed and knowingly allowed R.A. to remain in conditions and surroundings
that endangered his physical and emotional well-being.  See Tex. Fam. Code Ann. § 161.001(1)(D).  The evidence is thus legally sufficient to
support the trial court’s termination findings under section 161.001(1)(D) of the Family Code. 
See id.; In re J.T., No. 13-08-00652-CV, 2009 WL
2077184, at *13 (Tex. App.—Corpus Christi July 16, 2009, no pet.) (mem.
op., not designated for publication) (holding evidence
that mother allowed child to remain in home in which there was violent conduct,
as evidenced by father’s physical abuse of mother during her pregnancy, was
legally sufficient to support termination) (citing In re H.C., 942 S.W.2d 661, 665 (Tex.
App.—San Antonio 1997, no writ) (holding evidence legally sufficient under sections
(D) and (E)).

Viewing
the evidence as a whole, we hold a rational trier of fact could have reasonably
formed a firm belief or conviction that Jordan knowingly placed and knowingly
allowed R.A. to remain in conditions and surroundings that endangered his
physical and emotional well-being.  Thus,
the evidence is factually sufficient to support the trial court’s finding on
the section 161.001(1)(D) ground.  See Tex. Fam. Code Ann. § 161.001(1)(D); In re J.T., 2009 WL 2077184 at *13 (holding evidence that mother
allowed child to remain in home in which there was violent conduct, as evidenced
by father’s physical abuse of mother during her pregnancy, was factually
sufficient to support termination).

B.      Endangering by
Engaging in Conduct (Section E)

          1.       Applicable Law

The trial
court must find by clear and convincing evidence that the parent engaged in
conduct or knowingly placed the child with persons who engaged in conduct which
endangers the physical or emotional well-being of the child.  Tex.
Fam. Code Ann. § 161.001(1)(E) (Vernon Supp.
2009).  The relevant inquiry is whether
evidence exists that a parental course of conduct endangered the child’s
physical or emotional well-being.  In re R.D., 955 S.W.2d at 368.  Termination under section E must be based on
more than a single act or omission; what is required is a voluntary,
deliberate, and conscious course of conduct. 
In re J.J.S., 272 S.W.3d 74,
78 (Tex. App.—Waco 2008, pet. struck).  The
conduct does not have to occur in the presence of the child.  See Dir. of Dallas County Child Protective
Servs. v. Bowling, 833 S.W.2d 730, 733 (Tex. App.—Dallas 1992, no
writ).  To determine whether termination
is necessary, courts look to parental conduct both before and after the child’s
birth.  In re J.T.G., 121 S.W.3d 117, 125 (Tex.
App.—Fort Worth 2003, no pet.).  

“To
endanger” means to expose a child to loss or injury or to jeopardize a child’s
emotional or physical health.  Robinson
v. Tex. Dep’t of Protective & Regulatory Servs., 89 S.W.3d 679, 686 (Tex.
App.—Houston [1st Dist.] 2002, no pet.) 
(citing Boyd, 727 S.W.2d at 533).  The term means “more than a threat of
metaphysical injury or the possible ill effects of a less-than-ideal family
environment.”  Id. (quoting Boyd, 727 S.W.2d at
533).  However, danger to a child
need not be established as an independent proposition and may be inferred from
parental misconduct even if the conduct is not directed at the child and the
child suffers no actual injury.  See id.; Vasquez
v. Tex. Dep’t of Protective & Regulatory Servs., 190 S.W.3d 189, 195
(Tex. App.—Houston [1st Dist.] 2005, pet. denied).  

Conduct
that subjects a child to life of uncertainty and instability endangers the
child’s physical and emotional well-being. 
In re S.D.,
980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).  A parent’s mental state may be considered in
determining whether a child is endangered if that mental state allows the
parent to engage in conduct that jeopardizes the physical or emotional
well-being of the child.  In re J.I.T.P., 99 S.W.3d 841, 845 (Tex.
App.—Houston [14th Dist.] 2003, no pet.); see
also In re C.M.B., 204 S.W.3d 886, 895 (Tex. App.—Dallas 2006, pet.
denied).  A parent’s mental instability
and attempt to commit suicide may contribute to a finding that the parent
engaged in a course of conduct that endangered a child’s physical or emotional
well-being.  In re J.T.G., 121 S.W.3d at 126; see In re A.M.C., 2 S.W.3d 707, 716 (Tex. App.—Waco 1999, no pet.)
(upholding jury’s determination of endangerment where evidence showed mother’s
suicidal thoughts, suicide attempts, and neglect); see also In re C.D., 664 S.W.2d 851, 853 (Tex. App.—Fort Worth
1984, no writ) (mental conditions and suicide attempts of parent were factors
in considering whether parent engaged in conduct that endangered emotional
well-being of child).

Abusive
and violent criminal conduct by a parent can produce an environment that
endangers the well-being of a child.  In re B.R., 822 S.W.2d
103, 106 (Tex. App.—Tyler 1991, writ denied).  Evidence as to how a parent has treated
another child or spouse is relevant regarding whether a course of conduct under
section E has been established.  In re D.T., 34 S.W.3d 625, 636–37 (Tex. App.—Fort
Worth 2000, pet. denied).  Evidence that
a person has engaged in abusive conduct in the past permits an inference that
the person will continue violent behavior in the future.  Schaban-Maurer v.
Maurer-Schaban, 238 S.W.3d 815, 824 (Tex. App.—Fort
Worth 2007, no pet.); see In re M.G.M.,
163 S.W.3d 191, 202 (Tex. App.—Beaumont 2005, no pet.).

          2.       Analysis

The trial
court made findings pertaining to section 161.001(1)(E) in support of its
determinations that (a) Jordan knowingly placed and allowed R.A. to remain with
Akin, who engaged in conduct that endangered R.A.’s physical or emotional
well-being, and (b) Jordan herself engaged in conduct that endangered R.A.’s
physical or emotional well-being.  See Tex.
Fam. Code Ann. § 161.001(1)(E).  

                   a.       Placing and Allowing R.A.
to Remain with Akin

For the
same reasons detailed in our analysis of section D, we conclude the evidence
supports the trial court’s determination that Jordan’s voluntary and knowing
placement of R.A. with Akin and her voluntary and knowing decision to allow
R.A. to remain with Akin by opting not to use earnest efforts until after
September 2007 to regain custody of R.A., endangered the physical and emotional
well-being of R.A.  See In re S.P., 168 S.W.3d 197, 204–05 (Tex. App.—Dallas 2005, no
pet.) (holding evidence supported termination of
mother’s parental rights where, among other factors, mother knowingly allowed
abusive and sexually deviant father to have access to children); In re J.M.M., 80 S.W.3d at 241–42; Hann, 969 S.W.2d
at 82–83.

 

                   b.      Jordan’s Direct Contact
with R.A.

In this
section, therefore, we address Jordan’s direct conduct that endangered
R.A.  Deferring to the trial court’s credibility
determinations, the record supports the trial court’s findings that Jordan
engaged in conduct which endangered the physical or emotional well-being of
R.A. for several reasons.  First she
endangered him when he was a fetus.  See id.
at 203 (endangering conduct may include parent’s
actions before child’s birth); In re S.M.L.D., 150 S.W.3d 754, 757–58
(Tex. App.—Amarillo 2004, no pet.);  Avery
v. State, 963 S.W.2d at 553. 
Although she obtained prenatal care in the latter half of her pregnancy,
Jordan did not receive proper nutrition for most of her pregnancy due to her
decision to leave the shelter to be with Akin. 
Compare Mann v. Dep’t of Family & Protective Servs., No. 01-08-01004-CV, 2009 WL
2961396, at *11 (Tex. App.—Houston [1st Dist.] Sept. 17,
2009, no pet.) (mem. op., not designated for publication) (considering under section E that mother took prenatal
vitamins as evidence that undermined argument that she engaged in course of
conduct that endangered child).  In
addition to failing to properly care for R.A. for the entire time he was a
fetus, Jordan also tried to end his existence by attempting suicide when he was
an eight-month fetus.  This deliberate
conduct endangered R.A. physically before he was born.  See In re A.M.C., 2 S.W.3d at 716 (finding endangerment from
mother’s suicidal ideations, attempts and neglect).  Jordan also physically endangered R.A. before
he was born by remaining with Akin, who was repeatedly physically abusing her
to the point that she knew he was endangering R.A. as a fetus.  See In
re J.T., 2009 WL 2077184 at *12 (holding evidence legally and factually
sufficient to terminate mother’s parental rights under section E for
endangering physical well-being of child based in part on evidence that mother
remained with physically abusive person while she was pregnant); see also In re J.I.T.P., 99 S.W.3d at
845 (holding trial court could have properly considered the domestic violence
and physical altercation during mother’s pregnancy as evidence of
endangerment).   

Second, Jordan
has lived an unstable, transient lifestyle that indicates a pattern of engaging
in conduct that would endanger R.A. emotionally and physically.  See Bowling, 833 S.W.2d at 733
(conduct does not have to occur in presence of child and can be considered even
if child living elsewhere at time of events). 
Between December 2006 and September 2007, she was kicked out of the Rose
Home shelter for violent conduct, she then attempted
suicide, and then resided at various points in time in a hospital, in a shelter,
or was homeless.  Although none of her
conduct at that time was directed at harming R.A., endangering conduct is not
limited to actions directed toward the child. 
See In re J.I.T.P., 99 S.W.3d
at 844 (endangering acts need not be directed at or actually cause injury to
child).  The trial court could reasonably
determine that Jordan’s propensity for violence against herself and others,
want of self control, and transient lifestyle would endanger R.A. by giving him
a life of instability and uncertainty.  See id. at 845 (holding
trial court could have considered mother’s desire to hurt herself and her
history of noncompliance with her medication schedule as factors endangering
child); In re N.S.G., 235 S.W.3d at 358,
367 (Tex. App.—Texarkana 2007, no pet.) (noting that if evidence shows course
of conduct which has effect of endangering physical or emotional well-being of
child, finding under section E is supportable); see also In re J.J.S., 272
S.W.3d at 78 (requiring course of conduct under section E).

Jordan
points to evidence that she had not attempted suicide for over a year, has not
been hospitalized for over two years, and that her mental illness is in
remission.  Other than her trial
testimony that the court found lacking in credibility, Jordan provided no
evidence that her mental illness is in remission.  The record shows Jordan was last hospitalized
in January 2007; however, medical records from February through November 2008
repeatedly diagnose Jordan as still having “[m]ajor
depressive disorder, recurrent, severe with psy[chotic]
features, seizure disorder.”  Additionally,
the record shows, and the court made findings, that Jordan was first diagnosed
with major depression and personality disorder at the age of 15.  Between 1996 and 2003, she was in and out of
several mental health care facilities. 
She has tried to commit suicide 10 to 15 times and has been hospitalized
20 times.  She has been either homeless,
in a shelter, in housing associated with a shelter, or in a hospital for most
of R.A.’s life.  Jordan is currently
diagnosed with bi-polar disorder, major depression, chronic post-traumatic
stress syndrome, and borderline personality disorder.  At the time of trial, Jordan was not
attending all of her mental health appointments, and she was not taking her
medications as prescribed.  

Although
there are recent developments that show improvements in Jordan’s condition, the
trial court could reasonably determine any evidence of improvement was short
lived and outweighed by the extent of her mental history over the course of
most of her life, the number of suicide attempts, the number hospitalizations,
her minimization of her present mental condition, and her present failure to
strictly comply with her medication and therapy.  See
In re J.I.T.P., 99 S.W.3d at 845
(considering in termination proceeding under section E that mother had
recurrent depression, borderline personality disorder, post-traumatic stress syndrome,
partial complex seizures, thoughts of suicide, and was not compliant with
medications); In re C.D., 664 S.W.2d
at 853 (considering mother’s schizophrenia and resulting suicidal thoughts,
hospitalizations, and violence); In re
J.O.A., 283 S.W.3d 336, 346 (Tex. 2009) (deferring to trial court to weigh
evidence of significant recent improvements, especially of short duration,
against probative value of irresponsible choices).  Based on Jordan’s past and present conduct,
the trial court could reasonably infer that if R.A. lived with her in the
future, her instability would physically and emotionally endanger him by giving
him a life of uncertainty.  See Schaban-Maurer, 238 S.W.3d at 824; In
re M.G.M., 163 S.W.3d at 202.   

                   3.       Conclusion

Viewing
all the evidence in the light most favorable to the judgment, we hold a
fact-finder could reasonably have formed a firm belief or conviction that Jordan
knowingly placed and allowed R.A. to remain with persons who engaged in conduct
that endangered the physical and emotional well-being of R.A., and Jordan
engaged in conduct that endangered the physical and emotional well-being of
R.A.  See
Tex. Fam. Code Ann. § 161.001(1)(E).  The evidence is
thus legally sufficient to support the trial court’s termination findings under
section E.  See In re J.I.T.P., 99 S.W.3d at 845.

Viewing
the evidence as a whole, we hold a rational trier of fact could have reasonably
formed a firm belief or conviction that (1) Jordan knowingly placed and allowed
R.A. to remain with persons who engaged in conduct that endangered the physical
and emotional well-being of R.A., and (2) Jordan engaged in conduct that
endangered the physical and emotional well-being of R.A.  See
Tex. Fam. Code Ann.
§ 161.001(1)(E). 
Thus, the evidence is factually sufficient to support the trial court’s
termination findings under section E.  See In
re J.I.T.P., 99 S.W.3d at 845.

C.      Failing to Support for Six Months (Section
C)

          1.       Applicable Law

The court
may terminate the parent-child relationship if the court finds by clear and
convincing evidence that the parent has left the child alone or in the
possession of another without providing adequate support for the child and
remained away for a period of at least six months.  See
Tex. Fam. Code Ann. § 161.001(1)(C)  (Vernon Supp. 2009).  This ground is commonly characterized as the
abandonment of a child by a parent.  See In re J.R., No. 08-08-00058-CV, 2010
WL 375676, at * 3 (Tex. App.—El Paso Feb. 3, 2010, no pet.); In re T.B.D., 223 S.W.3d 515, 518 (Tex. App.—Amarillo
2006, no pet.). The six-month period is a period of at least six consecutive
months. See In re T.B.D., 223 S.W.3d at 518. 

          2.       Analysis

The trial court made findings of fact
pertinent to section 161.001(1)(C) that Jordan gave three week old R.A. to
Akin; that she took “no steps to seek his return through civil court
proceedings until around October 2008”; that she provided no support, goods, or
money for the child after November 24, 2006; that she did not make adequate
arrangements for the support of the child when she relinquished possession of
the child to Akin in November 2006; and that she relinquished the child to Akin
who had no job, no residence, and no visible means to support himself or the
child.  Deferring to the trial court’s
credibility determinations, the record supports these findings.  These findings and the record establish that
Jordan voluntarily placed R.A. in the possession of Akin, she did not provide
any support to R.A., and she voluntarily remained away for a period of at least
six months from November 24, 2006 to September 2007.  

It is undisputed that Jordan has
never provided any support of any kind to R.A. since he was three weeks of
age.  We have already detailed above the
evidence that shows Jordan voluntarily placed R.A. with Akin on approximately
November 24, 2006 and voluntarily left him with Akin until she tried to seek
assistance from the police after September 2007.  We have also noted she knew where Akin was
until September 2007.  The evidence,
therefore, shows that although she knew where R.A. was, she did not support
R.A. in any way for at least nine months. 


Even if we exclude the period of time
when DHS investigated the situation, DHS closed its case on January 10,
2007.  Beginning January 10, Jordan did
not support R.A. in any way from then through at least six months to July 10,
2007.  We note that the record shows that
on June 20, 2007, Legal Aid sent a letter to Jordan declining full
representation, but offering to draft documents.  As we have observed above, the trial court
could reasonably have determined that was not an earnest effort by Jordan to
regain custody of R.A.  Excluding the
time of the DHS investigation, Jordan failed to provide any support to R.A. for
six months from January 10 to July 10, 2007.

Jordan relies upon Holick v. Smith to assert she does not
herself need to provide support.  685 S.W.2d 18 (Tex. 1985). 
In Holick, the mother of two
children had difficulties caring for the children and eventually left the
children with her niece to be cared for by the niece until the mother improved
her living conditions.  Id. at 19. After
she left the children with the niece, she moved to another city and obtained
employment.  Id.  She did not send money
to help support the children, but the niece did not expect her to do so.  Id.  The mother did not visit or write the
children for over six months, although she did call and talk to them once
during that period, and expressed an intent to return
for the children.  Id. at 19, 20.  The niece eventually sought termination of
the mother’s rights, and the trial court terminated the mother’s rights under
section C.  Id.  On appeal to the Texas
Supreme Court, she contended that she was not required to actually support the
children, but only make arrangements for their adequate support.  Id. at 21.  The
Supreme Court agreed.  It held the mother
was required to “make arrangements for the adequate support” rather than
personally support the children, and concluded that the mother had met this
standard.  Id.

In this case, Jordan did not make
“arrangements for the adequate support” of R.A. 
Excluding the testimony of Jordan, the evidence shows that she initially
relinquished R.A. to Akin, an abusive man and convicted sex offender who lived
a transient lifestyle.  After DHS closed
its case on January 10, 2007, Jordan did not try to regain possession of R.A.,
did not again contact DHS, and did not ensure that Akin was adequately
supporting R.A. even though she knew the location of Akin and R.A.  Additionally, unlike in Holick, there was no understanding between Akin and Jordan that
Jordan would not be sending support because Akin could provide adequate support
on his own.  As Akin said in his own
letters, Jordan “stuck” R.A. with him, she “never once helped [him] when [he]
had [R.A.],” he “tried for almost 6 month[s]” to locate Jordan but she
“vanished off the face of the earth,” and he needed her “more than ever at that
time and so did [R.A.] [b]ut [p]oof
[she] vanished.”  The evidence clearly
shows that Jordan did not make arrangements for the adequate support of R.A. Cf. In re R.N.G., No. 11-02-00084-CV,
2002 WL 32344622, at *2 (Tex. App.—Eastland Dec. 12, 2002, no pet.) (mem. op.,
not designated for publication) (holding evidence
insufficient to terminate mother’s parental rights under section C because
mother made arrangements for adequate support of children, evidence showed
mother left children with father who maintained steady employment and
adequately supported children, mother knew that father would provide adequate
support, and mother left children pursuant to agreed divorce decree). 

Jordan also relies upon In re T.B.D. to argue her rights should
not be terminated.  223
S.W.3d 515.  In T.B.D., the father had attempted to
contact the child from prison through correspondence.  Id. at 519.  The court
found that although the father was incarcerated, there was insufficient proof
of the “remaining away” requirement of section C, especially in light of the
fact that the father attempted to contact the child.  Id.  The facts in this case are not analogous to
those in T.B.D.  As demonstrated above, apart from Jordan’s
testimony, the evidence shows that Jordan knew where R.A. and Akin were for the
six-month period of time from January to June 2007, yet she did not go to see
them.  Her only explanation that she gave
Detective Feskanich for not visiting them was that she had a curfew.  Although an inmate’s sole means to
communicate with a young child is by letter, that type of communication is
wholly inadequate when the person lives in the same city and is physically
capable of maintaining personal contact with the child.

          3.       Conclusion

Viewing all the evidence in the light
most favorable to the judgment, we hold a fact-finder could reasonably have
formed a firm belief or conviction that Jordan failed to provide any support to
R.A. for a continuous six month period of time.   See
Tex. Fam. Code Ann. § 161.001(1)(C).  The evidence is
thus legally sufficient to support the trial court’s termination findings under
section 161.001(1)(C) of the family code.  See id.

Viewing
the evidence as a whole, we hold a rational trier of fact could have reasonably
formed a firm belief or conviction that Jordan failed to provide any support
for R.A. for a continuous six month period of time.  See
Tex. Fam. Code Ann. § 161.001(1)(C).  Thus, the
evidence is factually sufficient to support the trial court’s finding on the
section 161.001(1)(C) ground.  See id.

D.      Conclusion of Section
161.001(1) Analysis

          Although only one ground under section 161.001(1) is
required for termination of parental rights under that section, the trial court
found three grounds, and we have determined the evidence is legally and
factually sufficient to support each independent ground.  See In
re J.L., 163 S.W.3d at 84 (stating that petitioner must establish only one
ground listed under section 161.001(1)). 


 

Best Interest Finding

Having
determined the evidence is sufficient to establish at least one of the grounds
in section 161.001(1), we now consider the best interests of R.A.

A.              
 Applicable Law

Prompt and permanent placement of the child in a safe
environment is presumed to be in the child’s best interest.  See In
re M.C.T., 250 S.W.3d 161, 170 (Tex. App.—Fort Worth 2008, no pet.) (citing Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008)).  There is also a strong presumption that a child’s
best interests are served by maintaining the parent-child relationship. In re L.M., 104 S.W.3d 642, 647
(Tex. App.—Houston [1st Dist.] 2003, no pet.).   Nevertheless, while parental rights are of
constitutional magnitude, they are not absolute.  See In re C.H., 89
S.W.3d 17, 26 (Tex. 2002).  Just
as it is imperative for courts to recognize the constitutional underpinnings of
the parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.  Id. 


In Holley
v. Adams, the Texas Supreme Court provided a nonexclusive list of factors
that the trier of fact may use in a termination case to determine the best
interest of the child.  544 S.W.2d 367, 371–72 (Tex. 1976).  These factors include (1) the desires of the
child; (2) the emotional and physical needs of the child now and in the future;
(3) the emotional and physical danger to the child now and in the future; (4)
the parental abilities of the individuals seeking custody; (5) the programs
available to assist these individuals to promote the best interest of the
child; (6) the plans for the child by these individuals or by the agency
seeking custody; (7) the stability of the home or proposed placement; (8) the
acts or omissions of the parent that may indicate that the existing
parent-child relationship is not a proper one; and (9) any excuse for the acts
or omissions of the parent.  Id.  These factors are not exhaustive, and there is
no requirement that the petitioner prove all factors as a condition precedent
to parental termination. In re C.H., 89 S.W.3d at 27; Adams v. Tex.
Dep’t of Family & Protective Servs., 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.]
2007, no pet.).  

The same
evidence of acts or omissions used to establish grounds for termination under
section 161.001(1) may be probative in determining the best interests of the
child. In re C.H., 89 S.W.3d at 28; In
re L.M., 104 S.W.3d at
647.  Evidence of just one factor may
suffice as support of a finding that termination is in the best interest of the
child.  See In re C.H., 89 S.W.3d at 27. 
However, termination of the parent-child relationship is not justified
when the evidence shows merely that a parent’s failure to provide a more
desirable degree of care and support of the child is due solely to misfortune or
the lack of intelligence or training, and not to indifference or malice. Clark v. Dearen, 715 S.W.2d 364,
367 (Tex. App.—Houston [1st Dist.] 1986, no writ).  

B.              
Analysis

We address
the nine factors to determine whether the evidence is legally and factually
sufficient to show that termination of Jordan’s parental rights is in the best
interest of R.A.

1.       Desires
of Child

Regarding
the first factor, because of R.A.’s youth, R.A’s desires cannot be
determined.  This factor, therefore, is
inconsequential in this case.  See In re M.T., No. 14-02-00973-CV, 2003
WL 22054247, at *2 (Tex. App.—Houston [14th Dist.] Sept. 4,
2003, no pet.) (mem. op., not designated for publication) (noting child of two years old too young to express her
desires).

2.       Emotional
and Physical Needs Now and In Future, and 

3.       Emotional
and Physical Danger Now and in the Future 

 

The record
shows that by the time of the trial, R.A. had not completely
recovered from the circumstances he had lived under, but he was doing much
better due to the care of the Dosseys. 
R.A. still stores food in his mouth when he eats, but he now enjoys
taking a bath.  The Dosseys have nurtured R.A. from
his unhealthy condition to that of a healthy young boy developing verbal and
motor skills, emotional attachment, and overcoming fears.

If R.A.
was detached from the Dosseys, then he would face emotional harm.  At trial, Cravens, an expert in child
development, testified that after attachment has occurred a child cannot be moved
without a measure of harm.  She testified
that a break in attachment and a move would likely impact R.A.’s ability to
trust others and his ability to empathize with others when he is older.  Cravens testified that it would be best not
to break attachment at R.A.’s age, but if it must be broken to do it slowly and
carefully.  Despite acknowledging Cravens’s testimony, Jordan testified at trial that she
wanted to break R.A.’s attachment with the Dosseys and that if awarded custody,
she did not want the Dosseys to be a part of R.A.’s life.

Jerry testified
that he tried multiple times to meet Jordan but she has refused to meet, as
well as indicated an unwillingness to work with them regardless of what the
court decides about R.A.  Jordan’s
unwillingness to work with the Dosseys in making any necessary transition makes
it probable that R.A. would be harmed by the break in the attachment he has
with the Dosseys.

The trial
court found that Jordan had placed her own needs above R.A.  For example, after Jordan found out the
Dosseys had possession of R.A., she did not attempt to
contact them to find out how R.A. was doing or to send any support for R.A. or
even a birthday card.  Since then,
however, Jordan has had some supervised visitation with R.A.

The
Dosseys would serve well the emotional and physical needs of R.A.  The Dosseys have been married for 13 years
and have another child with whom R.A. has bonded.  The evidence is undisputed that the Dosseys
provide a stable home and that they will be able to continue to meet R.A.’s
emotional and physical needs.  The second
and third factors weigh in favor of termination of Jordan’s parental
rights.  See Dupree v. Texas Dep’t of Protective & Regulatory Servs.,
907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ) (“The need for permanence is the paramount consideration for the
child’s present and future physical and emotional needs.”); see also Tex. Fam. Code Ann. § 263.307(a).

4.       Parenting
Abilities

Although
Jordan had only a limited time with R.A., in that limited time she demonstrated
weak parenting abilities.  She attempted
to commit suicide while pregnant with R.A. 
After R.A. was born, she allowed Akin to care for R.A. even though he
had repeatedly abused her, had housed her in crack houses, was a sex offender,
and could not financially provide for food for her.  As Jordan noted at trial, she has never taken
care of a child full-time.  She did take
one online parenting class one week before trial, but has not taken other
parenting courses since she was pregnant. 
At trial, Jordan testified that she had some experience
taking care of children, but that testimony was inconsistent with her earlier
statements produced during discovery.

The record shows Jordan has weak parenting abilities.  It is undisputed the Dossey’s have been
excellent parents to R.A.  The fourth factor,
therefore, weighs in favor of termination of Jordan’s parental rights.  See Castorena
v. Tex. Dep’t of Protective & Regulatory Servs., No. 03-02-00653-CV, 2004 WL 903906, at *11 (Tex. App.—Austin
April  29, 2004, no pet.) (noting “[i]t is not in a child’s
best interest that he be made a guinea pig” upon whom parents should be allowed
to practice until they might become more proficient in child care). 

5.       Programs Available to Assist in Care of
R.A.

Due to her diagnosis of epileptic seizures, Jordan receives
governmental disability income of $674 per month to live on, albeit it would increase if she was
awarded custody.  Jordan has received
food stamps for approximately one year. 
Jordan testified that she has an ability to take advantage of programs that
could promote R.A.’s best interests.  Jordan
has no family in Oklahoma, and she complained of extensive abuse from her own
mother and molestation from a family member, so it is unlikely she would be
able to receive family support.  

The
financial resources that a stable family like the Dossey can provide could help
pay for any social or counseling programs that R.A. may need in the
future.   The fifth factor neither weighs
in favor of or against termination of Jordan’s parental rights.  

6.       Plans
for the Child, and

7.       Stability
of Home

 

Although
Jordan testified she has plans to be a good mother to R.A., the record
indicates she does not have the ability to be one.  At trial, she admitted that if granted
custody, she planned to prevent the Dosseys from seeing R.A., even in light of
the expert’s testimony that this could damage R.A.’s emotional stability.  Furthermore, Jordan acknowledged at trial
that her home was not suitable for a two-year-old.  

  The Dosseys intend to raise R.A. as their own
child and adopt him.  There is no dispute
the Dosseys have provided R.A. with a stable home.  Jerry testified that he and his wife, Pam,
filed the lawsuit to terminate Jordan’s rights because they consider R.A. to be
their child who they love as part of their family, and whose best interest is
served by living with them.  Jerry said
he and his wife paid an attorney to pursue the lawsuit because they decided
they would do “anything that it takes to save [R.A.’s] life.”  

The sixth
and seventh factors weigh in favor of terminating Jordan’s parental
rights.  See In re C.A.J., 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003,
no pet.). (“Without stability, income, or a home, [a parent] is unable to
provide for the child’s emotional and physical needs” and parent’s instability
“threatens the physical well-being of the child”).

8.       Acts or
Omissions of Parent that May Indicate Existing Parent-Child Relationship is not
Proper One, and 

9.       Any
Excuse for Acts or Omissions of Parent

 

At the time of trial, Jordan testified she was taking four
prescription medications for anxiety, depression, seizures, and to help her
sleep.  She acknowledges she recently has periodically failed
to consistently take her seizure medications. 
She admitted that she had not attended all of her medical
appointments.  Jordan stopped all
psychological therapy in 2008.  She has
also hidden the extent of her mental instability to those that have tried to
help her in this case, including Special Agent Phill.  

Jordan
contends, nevertheless, that her depression is under control, that her epilepsy
is under control, and that she has not been hospitalized for over two years. 

Although she testified
that recently her mental situation has improved due to its remission, Jordan
did not provide any evidence that she is in remission, other than her own
testimony.  The OU medical records show that Jordan
had been hospitalized 20 times, but Jordan’s trial testimony denied it was that
many. Similarly, the medical records show she had 10 to 15 suicide
attempts, but at trial she could “only think of two specific times,” once as a
teenager and once as an adult.  At trial, Jordan continued to make
statements suggestive of a suicidal ideation by stating that her life is
not worth living without R.A.  

The record
undisputedly shows the Dosseys take excellent care of R.A. emotionally and
physically, and their family has a loving relationship with him.  They hope to adopt him into their
family.  Although the record shows Jordan
has had some improvement in her situation, her severe mental illness over the
course of most of her life that includes numerous hospitalizations and suicide
attempts show that termination is in R.A.’s best interest, particularly in
light of her present minimization of the situation, failure to take medications
strictly as prescribed, failure to continue to attend all medical appointments,
and decision to stop therapy.    The eighth and ninth factors weigh in favor
of terminating Jordan’s parent-child relationship with R.A.  See Castorena, 2004 WL 903906 at *9 (noting in termination
proceedings that “[a]though evidence of past misconduct or neglect alone may
not be sufficient to show present unfitness, the fact finder may permissibly
infer that an adult’s future conduct may well be measured by recent deliberate past
conduct as it relates to the same or a similar situation”).

 

C.      Conclusion
of Analysis

Termination
decisions cannot be used to reallocate children “to better and more prosperous
parents.”  See In re W.C., 98 S.W.3d 753, 758 (Tex. App.—Fort Worth 2003, no
pet.).  That is not the situation
presented here.  Although evidence shows
Jordan has made some recent improvements to her past situation, those
improvements cannot absolve her of her long history of irresponsible choices.  See
In re J.O.A., 283 S.W.3d at 346 (“While
the recent improvements made by [appellant] are significant, evidence of
improved conduct, especially of short-duration, does not conclusively negate
the probative value of a long history of . . . irresponsible choices.”).  

Jordan
contends her misfortunes are not grounds to terminate her parental rights.  A parent’s lack of education, training, or
misfortune is considered when reviewing excuses for acts or omissions of a
parent; however, these considerations do not negate evidence tending to show
that termination is in the child’s best interest.  In re S.H.A., 728
S.W.2d 73, 89–90 (Tex. App.—Dallas 1987, writ ref’d n.r.e.).  In this case, except for one inconsequential
and one neutral factor, each of the best interest factors weigh in favor of
concluding that termination of Jordan’s parental rights is in the best interest
of R.A.  Although Jordan has led a life
filled with various misfortunes, the trial court found the vast majority of her
explanations lacking in credibility and the evidence shows that placing R.A.
with her would endanger him emotionally in the future.  See id.

Jordan’s
plans to form a life with R.A. have not been met with actions that demonstrate
an ability to execute those plans.  For
example, she has an apartment, but acknowledges it is unfit for a two-year
old.  Additionally, she takes her
required medications, but not exactly as prescribed.  She continues to have an interest in suicide
as a solution to her problems as demonstrated by her statements that if she did
not get custody of R.A. her life would not be worth living.  Given her approximately 15 attempts at
suicide, this continued reference to a “life not worth living” suggests she
still sees suicide as a remedy for her problems.  It is not in R.A.’s best interest to place
him in an environment where his sole caretaker, who has attempted suicide at
least 15 times, sees suicide as a solution to problems. 

In light
of all the evidence, the trial court could have reasonably formed a firm belief
or conviction that termination of Jordan’s parental rights was in R.A.’s best
interest.  Accordingly, we hold the
evidence is both legally and factually sufficient to support the trial court’s
finding that termination of Jordan’s parental rights was in the best interest
of R.A.  See in re J.T., 2009 WL 2077184 at 14 (holding that evidence was
sufficient to support trial court’s best interest finding where mother allowed
child to be in contact with individual who had physically abused her, mother
was not capable of caring for child on her own, mother admitted at trial she
had not found stable employment, and child was doing well in her current
placement).

We
overrule Jordan’s first issue.

Conservatorship Rights 

In Jordan’s
second issue, she contends that if we reverse on the trial court’s termination
of Jordan’s parental rights, we remand for a determination by the trial court
of Jordan’s conservatorship rights. 
Because we find that the evidence is legally and factually sufficient to
uphold the trial court’s termination of Jordan’s parental rights, we overrule
Jordan’s second issue as moot.




Conclusion

          We
affirm the judgment of the trial court.

 

 

 

                                                                             Elsa
Alcala

                                                                             Justice

 

Panel consists of Chief Justice Radack, and Justices
Alcala and Higley.

 

 

 











[1]
          Tex. Fam. Code Ann. § 161.001(1)(C),
(D), & (E) (Vernon Supp. 2009).